UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MAXWELL HENRY**<br>4264 E Capitol Street NE<br>Apt 2<br>Washington, DC 20019<br>                      Plaintiff,<br><br>    v.<br><br>**DISTRICT OF COLUMBIA**<br>Office of the Attorney General<br>441 4th Street, NW<br>Washington, DC 20001<br><br>                      Defendant. | No. 23-cv-_____<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DAMAGES**

(Americans with Disabilities Act, Rehabilitation Act, District of Columbia Human Rights Act)

Plaintiff Maxwell Henry brings this action against Defendant District of Columbia under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and the District of Columbia Human Rights Act, D.C. Code § 2-1401 *et seq*. This suit arises from two interrogations of Mr. Henry conducted by Defendant District Columbia's Metropolitan Police Department (MPD), in which MPD officers discriminated against Mr. Henry on the basis of his intellectual disability. In particular, MPD officers failed to provide Mr. Henry with reasonable accommodations to which he was entitled and intentionally exploited Mr. Henry's obvious intellectual disability. MPD's method of administering interrogations, when applied to an obviously intellectually disabled person like Mr. Henry, impairs the truth-seeking goals of the interrogation. As a result of MPD's discrimination, Mr. Henry lost his opportunity to access his interrogations meaningfully and to the same extent as non-disabled arrestees, and he was therefore

1

caused greater injury than other arrestees. He brings a claim for compensatory relief and alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action presents federal questions as it seeks to redress violations of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the plaintiff's claims under the District of Columbia Human Rights Act, D.C. Code § 2-1401 *et seq*.

2. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because all of the events or omissions giving rise to this action occurred in this District.

## PARTIES

3. Plaintiff Maxwell Henry is an adult, intellectually disabled resident of the District of Columbia.

4. Defendant District of Columbia is a municipal corporation organized under the laws of the United States and authorized to sue and be sued. Defendant District of Columbia is responsible for the operation and supervision of the MPD and its officers.

## FACTUAL ALLEGATIONS

5. Mr. Henry has a significant and obvious intellectual disability with a classic presentation: he is suggestible, deferential to authority, and eager to please.

6. Mr. Henry's disability also impairs his ability to fully understand certain concepts and to communicate effectively.

7. Mr. Henry's intellectual disability has been documented by the District of Columbia Public Defender Service (PDS), and throughout his life. Mr. Henry's IQ score is 64. An IQ score of

70 to 75 and below indicates a significant limitation in intellectual function consistent with an intellectual disability. *See* American Psychiatric Association, "What is Intellectual Disability?"[1]

8. Mr. Henry's intellectual disability also significantly limits his ability to engage in major life activities, such as working. Mr. Henry is unemployed.

9. On September 5, 2022, Mr. Henry was arrested by MPD officers on suspicion of assault with a dangerous weapon and taken to the Sixth District Station.

10. There, two MPD officers, Detective Wright and Detective Wolfe, conducted a videotaped interrogation of Mr. Henry.

11. Mr. Henry's intellectual disability was obvious to Detectives Wright and Wolfe.

12. Mr. Henry's intellectual disability prevented him from understanding the true implications of the interrogation and his constitutional rights; hindered his ability to communicate effectively, including his ability to assert his constitutional rights; and made him particularly vulnerable to the manipulative interrogation tactics that the officers employed.

13. Mr. Henry was entitled to and in need of reasonable accommodation to fully understand the officers, the gravity of the situation, and his constitutional rights; to communicate effectively and assert his constitutional rights; and to navigate the coercive pressures of interrogation like an individual without an intellectual disability.

14. Despite Mr. Henry's obvious intellectual disability, at no point did the detectives provide Mr. Henry with any accommodation.

---

[1] *Available at*: https://www.psychiatry.org/patients-families/intellectual-disability/what-is-intellectual-disability.

15. In particular, the detectives did not pause the interrogation until counsel or a trained third-party advocate could be contacted to help Mr. Henry understand, communicate, and navigate an interrogation in the way that a person without an intellectual disability would.

16. Far from accommodating Mr. Henry's obvious intellectual disability, the detectives intentionally discriminated against Mr. Henry by employing a series of manipulative tactics that they knew, or should have known, were likely to be particularly effective because of Mr. Henry's disability, and they aimed to take advantage of his disability.

17. For example, instead of promptly reading Mr. Henry his *Miranda* rights, the detectives used an interrogation technique designed to induce waiver by establishing a friendly rapport with the interrogee before administering *Miranda* warnings.

18. The detectives also suggested that they could help Mr. Henry get out of trouble.

19. Because Mr. Henry's intellectual disability causes him to be particularly deferential to authority and eager to please, these tactics yielded both an extended pre-Miranda conversation about the offenses with which Mr. Henry was charged and an eventual *Miranda* waiver.

20. The detectives and Mr. Henry discussed various things—including the charges on which he was arrested—for 48 minutes of custodial interrogation before the detectives read Mr. Henry his *Miranda* rights. The detectives read Mr. Henry his *Miranda* rights around midnight.

21. Mr. Henry hesitated when asked if he understood his rights. He then stated that he was only saying "yes" to "get through this" so that he could go to sleep.

22. Both before and after being read his *Miranda* rights, Mr. Henry made self-inculpatory statements.

23. Because of MPD's discrimination, Mr. Henry was denied a meaningful opportunity to access his interrogation and was injured by the loss of that opportunity.

24. MPD's method of administering interrogation, including the "rapport-building" technique, a failure to request and wait for an attorney or third-party advocate, and other manipulative tactics, impairs the truth-seeking function of the interrogation when applied to an intellectually disabled suspect like Mr. Henry.

25. Later that night, Mr. Henry was transferred to the D.C. Jail.

26. Mr. Henry's case was assigned to D.C. Superior Court Judge Michael Ryan.

27. On September 7, 2022, after Mr. Henry was assigned counsel from the D.C. Public Defender Service (PDS), the Assistant United States Attorney (AUSA) assigned to Mr. Henry's case asked his counsel if Mr. Henry would be interested in speaking with MPD officers about an unrelated matter.

28. At Mr. Henry's preliminary hearing on September 9, Mr. Henry's counsel informed the AUSA that Mr. Henry was not willing to discuss the unrelated matter.

29. The AUSA later relayed to MPD that Mr. Henry did not want to discuss the unrelated matter.

30. Mr. Henry's PDS counsel also made it clear at the preliminary hearing that Mr. Henry was intellectually disabled, with an IQ of 64.

31. Despite the government's awareness that Mr. Henry had a serious intellectual disability, six days later, on September 15, two MPD detectives sought to exploit Mr. Henry's disability by seeking him out at the D.C. Jail and speaking with him without his counsel present, despite the fact that his counsel had informed the government that he did not wish to discuss the unrelated matter.

32. The officers did not sign in at the Jail, in violation of D.C. Jail policy.

33. When Mr. Henry saw the two detectives, he told the correctional officer on duty that he did not think he was supposed to talk with them; Mr. Henry's PDS counsel regularly cautions

clients against speaking with law enforcement once she is assigned to their case. The correctional officer told him to go into the room anyway and listen to what the detectives had to say.

34. D.C. Jail video footage shows Mr. Henry entering a room with the detectives.

35. The detectives began asking him about the unrelated matter and also talked with him about the crime with which he was charged.

36. Mr. Henry became upset and attempted to leave the room.

37. Mr. Henry asked the officers if his PDS lawyer or Judge Ryan knew he was being questioned again. The officers did not respond.

38. Mr. Henry's intellectual disability was again obvious to officers during this second interrogation, and he again required accommodation to understand the interrogation fully, communicate effectively, and navigate the interrogation like a non-disabled individual.

39. Nonetheless, officers did not provide him with an accommodation.

40. PDS was not notified that this interrogation would occur, nor did the government notify Mr. Henry's counsel about the interrogation afterwards.

41. PDS became aware of the interrogation at the Jail only when Mr. Henry later mentioned it to his lawyer.

42. The government's knowledge of Mr. Henry's obvious intellectual disability, MPD's attempt to get him to discuss the unrelated matter despite having been informed by Mr. Henry's counsel that Mr. Henry did not wish to discuss it, and the covert nature of the Jail interrogation, all suggest that the government hoped to exploit Mr. Henry's disability in order to get information regarding the unrelated matter.

43. Once Mr. Henry mentioned the Jail interrogation to his PDS team, PDS began to litigate the issue of the Jail interrogation within Mr. Henry's active criminal matter.

44. Portions of those proceedings were placed—and remain—under seal.

45. The government provided to the defense an audio recording of the interrogation at the Jail that was made by one of the detectives. In that recording, Mr. Henry can be heard asking the officers if they were recording him and stating that he did not wish to be recorded. In the recording, the officers can be heard lying to Mr. Henry, stating that they are not recording.

46. On October 12, 2022, as a result of what he learned about the interrogation at the Jail, Judge Ryan asked PDS to put together a release plan for Mr. Henry by the next day. Mr. Henry was released on October 13, 2022.

47. A status conference in Mr. Henry's criminal case, at which the Jail interrogation was going to be considered, was scheduled for November 3, 2022. On November 2, 2022, the government filed Notice of Nolle Prosequi for each charge in Mr. Henry's criminal matter. As a result, no conference took place, and no judge has ever ruled on the issues stemming from the interrogation that took place at the Jail.

48. Mr. Henry was confined from the time of his arrest on September 5, 2022, until October 13, 2022, after Judge Ryan had ordered his release. He faced several criminal charges until November 2, 2022, when the government dropped the charges against him. If Mr. Henry had been afforded the accommodation to which he was entitled, he would have been better able to navigate the interrogation process and possibly could have avoided confinement or had the charges against him dropped more quickly.

49. It was obvious that federally protected rights would likely be violated by MPD officers if they were not trained regarding how to accommodate and protect the rights of intellectually disabled

people in their custody, and the District was aware of that risk, but nevertheless failed to provide such training.

50. MPD, an agency of the District of Columbia, failed to implement policies and procedures to ensure it complied with federal disability rights laws and protected the rights of intellectually disabled people.

51. MPD has failed to train its officers regarding how to accommodate individuals with mental disabilities or how to conduct an investigation without exploiting those disabilities.

52. The risk is an obvious one. MPD officers frequently come into contact with and interrogate people with mental disabilities and are unlikely to be able to handle the situation properly without specialized training.

53. People with mental disabilities disproportionately interact with police and the criminal justice system. Approximately a quarter of individuals incarcerated in state correctional facilities report having a cognitive disability.[2] In fact, people with disabilities are approximately 44% more likely to be arrested by age 28 than their non-disabled peers (42.65% vs. 29.68%).[3]

54. Despite this obvious risk of violating federally protected rights, and a recent decision of the United States District Court for the District of Columbia, *Montgomery v. District of Columbia*, 2022 WL 1618741, at *20 (D.D.C. May 23, 2022), in which the court highlighted a nearly identical deficiency in MPD's training surrounding mental illness and disabilities, MPD has still failed to train its officers and is therefore directly liable for the violation of Mr. Henry's rights.

---

[2] U.S. Dep't of Justice Bureau of Justice Statistics, *Disabilities Reported by Prisoners* (March 2021), at 1, *available at* https://bjs.ojp.gov/content/pub/pdf/drpspi16st.pdf.

[3] Erin J. McCauley, *The Cumulative Probability of Arrest by Age 28 Years in the United States by Disability Status, Race/Ethnicity, and Gender*, 107 Am. J. Pub. Health No. 12 (Dec. 1, 2017), *available at* https://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304095.

## CLAIMS FOR RELIEF

**CLAIM I: Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq*.**

55. Title II of the Americans with Disabilities Act (ADA) states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

56. Mr. Henry is a qualified individual with a disability.

57. Defendant District of Columbia is a public entity covered by Title II of the ADA, 42 U.S.C. § 12131(1), and is therefore prohibited from discriminating against qualified individuals with disabilities, 42 U.S.C. §§ 12131 and 12132.

58. MPD is an instrumentality and agency of the District of Columbia, 42 U.S.C. § 12131(1)(B), and is therefore also prohibited from discriminating against qualified individuals with disabilities, 42 U.S.C. §§ 12131 and 12132.

59. Title II of the ADA prohibits discrimination in all activities, services, and programs of a covered public entity, including investigatory law enforcement activities like MPD's interrogations of Mr. Henry.

60. MPD violated the ADA by failing to reasonably accommodate Mr. Henry's disability when interrogating him on September 5, 2022, and September 15, 2022.

61. The implementing regulations of Title II of the ADA require that public entities make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

62. These modifications must provide disabled individuals with meaningful access to the service, program, or activity.

63. Mr. Henry's intellectual disability was obvious to the detectives who interrogated him at the Sixth District Station on September 5, 2022, and to the detectives who interrogated him at the Jail on September 15, 2022.

64. Nonetheless, Mr. Henry's interrogators provided him with no accommodation.

65. The detectives' method of administering interrogation impaired the truth-seeking goals of the interrogation with respect to Mr. Henry, an obviously intellectually disabled suspect.

66. MPD also intentionally discriminated against Mr. Henry in both interrogations by exploiting his diminished capacity to understand and communicate, and his heightened vulnerability to MPD's coercive tactics.

67. The Detectives sought to exploit Mr. Henry's disability by seeking him out for further interrogation at the D.C. Jail on September 15, 2022, after his disability had been made known to the prosecutorial team during the preliminary hearing on September 9, 2022. Mr. Henry's disability was also obvious to the MPD detectives during the Jail interrogation.

68. As a result of MPD detectives' discrimination, in violation of the ADA, Mr. Henry lost his opportunity to access his interrogations meaningfully and to the same extent as non-disabled individuals, thereby causing him greater injury than other arrestees.

69. Defendant District of Columbia is liable for these violations of Mr. Henry's rights by its agents and employees.

70. Defendant District of Columbia is also liable for these violations of Mr. Henry's rights because it had knowledge that harm to the federally protected right to be free from disability

discrimination was substantially likely in the context of MPD interrogations and failed to act upon that likelihood.

**CLAIM II: Violation of the Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**

71. Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a).

72. Maxwell Henry is a qualified individual with a disability.

73. Defendant District of Columbia, and its agencies, including MPD, receive federal financial assistance.

74. Section 504 of the Rehabilitation Act prohibits discrimination in investigatory law enforcement activities like MPD's interrogations of Mr. Henry.

75. Section 504 requires that covered entities provide disabled people with reasonable modifications to policies and procedures, such that they have meaningful access to the program or activity and are not discriminated against.

76. Mr. Henry's disability was obvious to interrogators at both interrogations.

77. MPD violated Section 504 by failing to reasonably accommodate Mr. Henry's disability during both interrogations, causing him greater injury or indignity than other arrestees.

78. The detectives' method of administering interrogation impaired the truth-seeking goals of the interrogation with respect to Mr. Henry, an obviously intellectually disabled suspect.

79. MPD also intentionally discriminated against Mr. Henry on the sole basis of his disability in both interrogations by exploiting his diminished capacity to understand and communicate, and his heightened vulnerability to MPD's coercive tactics.

80. The Detectives sought to exploit Mr. Henry's disability by seeking him out for further interrogation at the D.C. Jail on September 15, 2022, after his disability had been made known to the prosecutorial team during the preliminary hearing on September 9, 2022. Mr. Henry's disability was also obvious to the MPD detectives during the Jail interrogation.

81. As a result of MPD detectives' discrimination, in violation of Section 504, Mr. Henry lost his opportunity to access his interrogations meaningfully to the same extent as non-disabled individuals, thereby causing him greater injury than other arrestees.

82. Defendant District of Columbia is liable for these violations of Mr. Henry's rights by its agents and employees.

83. Defendant District of Columbia is also liable for these violations of Mr. Henry's rights because it had knowledge that harm to the federally protected right to be free from disability discrimination was substantially likely in the context of MPD interrogations and failed to act upon that likelihood.

**CLAIM III: Violation of the D.C. Human Rights Act, D.C. Code § 2-1401 *et seq.***

84. The DCHRA makes it unlawful for "a District government agency or office to limit or refuse to provide any facility, service, program, or benefit to any individual on the basis of an individual's . . . disability." D.C. Code § 2-1402.73.

85. Additionally, "[e]very individual shall have . . . an equal opportunity to participate in all aspects of life . . . ." D.C. Code § 2-1402.01.

86. MPD is an agency of the District of Columbia.

87. Mr. Henry is a person with a disability.

88. Mr. Henry's disability was obvious to detectives at both interrogations.

89. Nonetheless, detectives failed to provide Mr. Henry with a needed reasonable accommodation so that he could meaningfully access the interrogation.

90. Instead, detectives exploited his disability in hopes of gleaning as much information as possible.

91. The DCHRA also provides that "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C. Code § 2-1402.68.

92. The detectives' methods of administering interrogations, when applied to an obviously intellectually disabled suspect like Mr. Henry, constitutes discrimination on the basis of his disability.

93. As a result, Mr. Henry suffered greater injury and indignity than other arrestees, including, but not limited to, the lost opportunity to equally access his interrogation, emotional harm, and dignitary harm. After these interrogations, Mr. Henry felt disrespected and angry, and felt that his rights had been violated. Mr. Henry was also confined and faced criminal charges for more than a month following his first interrogation.

94. Defendant District of Columbia is liable for these violations of Mr. Henry's rights by its agents and employees.

95. Defendant District of Columbia is also liable for these violations of Mr. Henry's rights because it had knowledge that the right of persons like Mr. Henry to be free from disability discrimination was substantially likely in the context of MPD interrogations and failed to act upon that likelihood.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court:

A. AWARD Mr. Henry compensatory damages against Defendant in an amount appropriate to the evidence adduced at trial;

B. Alternatively, should the proper amount of compensatory damages be indeterminable, AWARD Mr. Henry nominal damages in recognition of the importance to organized society that protected disability rights be scrupulously observed;

C. AWARD Mr. Henry his reasonable attorneys' fees and costs in this action as provided in 42 U.S.C. § 1988(b), D.C. Code §§ 2-1403.16(b) & 2-1403.13(a)(1), and 4 DCMR § 207; and

D. GRANT Plaintiff such further relief as this Court deems appropriate.

## JURY DEMAND

Plaintiff requests a trial by jury on any and all issues raised by this Complaint which are triable of right by a jury.

September 5, 2023

Respectfully submitted,

/s/ *Arthur B. Spitzer*
Arthur B. Spitzer (D.C. Bar No. 235960)
Laura K. Follansbee (D.C. Bar No. 1782046)
American Civil Liberties Union Foundation
  of the District of Columbia
915 15th Street NW, Second Floor
Washington, D.C. 20005
202-601-4266
aspitzer@acludc.org

*Counsel for Plaintiff*